# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 10-65** |
| **IRVING ALVIN,** *et al.* | : | |

## <u>MEMORANDUM</u>

**Schiller, J.**                                                                                     **July 1, 2014**

Irving Alvin and George Duffy face charges of conspiracy to commit bank robbery, attempted bank robbery, carrying a firearm in relation to a crime of violence, being felons in possession of a weapon, and aiding and abetting the commission of those crimes. The joint trial against both Defendants has commenced twice and ended in mistrial both times. On March 13, 2014, at a pretrial hearing on an unrelated issue, Alvin's lawyer alerted the Court several FBI reports had been disclosed to Defendants on the previous day. Alvin argued the reports, which dated from 2010 and 2011, were *Brady* material. The trial, then scheduled for March 17, 2014, was continued to allow the parties to fully brief the issue. Now before the Court are Defendants' motions to dismiss the indictment and the Government's motion for designation of a new trial date. Defendants argue that proceeding to trial would violate their Sixth Amendment rights to a speedy trial, the rule announced in *Brady v. Maryland*, 373 U.S. 83 (1963), and the Double Jeopardy Clause of the Fifth Amendment. For the reasons that follow, the Court grants the motions and dismisses the superseding indictment as to both Defendants.

## I.        FACTUAL AND PROCEDURAL HISTORY

On May 1, 2009, a police officer noticed two men near the rear of a PNC Bank in Conshohocken, Pennsylvania. This officer, Sgt. Conner, testified that he exchanged words with

the men as he approached the bank. After this brief interaction, the men ran from the bank. A witness observed one of these men, and he followed the runner for some distance, eventually observing him toss a duffel bag onto a nearby garage. Roughly thirty minutes later, another resident observed Alvin walking down the street in his neighborhood. Because the Alvin looked unfamiliar, the resident called the police to alert them of Alvin's presence. Officers arrested Alvin shortly thereafter. Sgt. Conner apprehended the other individual he had seen behind the bank, Demetrius White, as he fled. White is now deceased. The duffel bag thrown by the suspect was eventually found to contain a firearm, another duffel bag, zip-ties, and at least one screwdriver. A pair of gloves was also recovered near the bank.

Alvin was federally indicted on February 4, 2010, and was transferred to federal custody shortly thereafter. He has been incarcerated since his arrest on May 1, 2009. Alvin's first trial was scheduled for March 29, 2010. This trial date was continued, as were the next three trial dates set by this Court. On January 6, 2011, the Government issued a Superseding Indictment as to Alvin and a new Co-Defendant, George Duffy. The Government posited that Duffy was the getaway driver, and he and Alvin were charged with the same crimes. According to the Government, one eyewitness and DNA evidence found on a glove recovered near the bank connect Alvin to the scene of the crime. The Government contends that Alvin attempted to call Duffy at the time of the crime. Alvin asserts that he was not one of the men behind the PNC Bank on the morning of the crime, and Duffy denies that he was the getaway driver. Duffy argues that no physical evidence (including video evidence) connects him to the crime, no eyewitnesses put him near the crime, and that a cellphone communications expert will testify that phone records do not implicate him in the crime.

The initial trial commenced on November 26, 2012. This was the fifth trial date that the Court set for Alvin, and the third date it set for Duffy. On the second day of the trial, the Court declared a mistrial after the Government elicited impermissibly prejudicial testimony from one of its witnesses. The second trial began on November 4, 2013. This was the ninth trial date that the Court had set for Alvin, and the seventh trial date for Duffy. This trial also ended in mistrial on its second day. Three issues prompted the Court to grant a mistrial: the Government played an audiotape of Alvin referring to his parole officer; the FBI forensic examiner referred to a database of "convicted persons'" DNA; and the FBI forensic examiner testified that twenty-six pieces of evidence (of which Defendants previously had no knowledge) had been submitted to FBI laboratories for testing.

The Court net a new trial date for March 17, 2014, which was the eleventh trial date set for Alvin and the ninth date set for Duffy. However, on March 12, 2014, the Government sent Defendants four FBI reports that it had not previously disclosed. Those reports were dated April 15, 2010; May 25, 2010; November 9, 2010; and February 4, 2011. The report dated May 25, 2010, concluded that hair from a Caucasian male was found in the debris associated with objects tied to the suspect. Alvin and Duffy are both African American. The Court was made aware of this disclosure at a hearing on an unrelated matter on March 13, 2014, at which neither Duffy nor his attorney was present. The Court continued the next trial date and ordered the parties to submit briefs on whether the Government had violated the Speedy Trial Act or the rule announced in *Brady v. Maryland*.

Both Defendants have now moved to dismiss the indictments against them on three grounds: 1) that retrial would violate double jeopardy; 2) that the rule of *Brady v. Maryland* was violated by the Government's delayed disclosure of the FBI reports; and 3) that their

constitutional speedy trial rights have been violated.[1] The Court will address each of these arguments.

## II.     DOUBLE JEOPARDY CLAIM

### A.     Legal Standard

The Double Jeopardy Clause of the Fifth Amendment commands that a criminal defendant cannot be repeatedly prosecuted for the same offense, but it is not an absolute bar to retrial. *United States v. Dinitz*, 424 U.S. 600, 606-07 (1976). Courts apply the following standard to determine whether double jeopardy attaches following a Government-provoked mistrial:

> Prosecutorial conduct that might be viewed as harassment or overreaching . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Oregon v. Kennedy*, 456 U.S. 667, 675-76 (1982).

The Third Circuit has "consistently emphasized that application of the double jeopardy bar is dependent on a showing of the prosecutor's subjective intent to cause a mistrial in order to retry the case." *United States v. Williams*, 472 F.3d 81, 85-86 (3d Cir. 2007). To assess the prosecutor's subjective intent, courts examine the actions of the prosecutor and the context of the first trial, including whether it appeared likely that the jury would acquit the defendant. *See United States v. Curtis*, 683 F.2d 769, 777 (3d Cir. 1982).

### B.     Discussion

Defendants argue that the Government twice goaded Defendants into moving for a mistrial by introducing prejudicial evidence or eliciting prejudicial testimony from a witness.[2]

---

[1] Alvin joined Duffy's motion to dismiss, which asserts these three claims. Thus, the Court will analyze all three claims as to each Defendant.

The Court already denied Defendants' motions, filed after the first mistrial, to bar the second trial on double jeopardy grounds. The Court will not revisit that decision, but now addresses the question of whether the Government's behavior in provoking the second mistrial precludes a third trial.

Defendants' principal argument is that the Government's errors were so substantial and numerous that the Government must have intended to goad the Defendants into seeking a mistrial. Prior to the trial, the Court had ruled to exclude evidence of the Defendants' prior crimes. However, the Government played an audio recording of an incarcerated Alvin speaking on the phone with a friend. A transcript of the phone call was simultaneously shown to the jury on a screen. The Government had agreed to redact parts of the audio recording and transcript, but the jury heard a recording, and saw a transcript, of Alvin referring to his parole officer. The Government later asserted that a "software glitch" had removed all of the redactions. Counsel for Alvin objected to the playing of the audio file, but the Court delayed ruling on that objection and allowed the trial to proceed. The Government's next witness was a forensic examiner at an FBI lab. The examiner testified that she conducted her analysis by comparing the DNA sample to a database of "convicted offenders," and she mentioned that twenty-six additional pieces of evidence had been submitted to other FBI labs for testing, but that she had not personally analyzed these items and knew nothing of the results. At this point, Alvin formally moved for a mistrial. The Court granted that motion based on the recorded reference to Alvin's parole officer, the forensic examiner's reference to convicted persons, and the discovery that Defendants were not notified about the forensic testing of some evidence.

---

[2] Alvin moved for a mistrial on both occasions, but Duffy only joined Alvin's motion during the second trial. However, Duffy did not object to the granting of a mistrial during the first trial, and he now seeks to invoke the double jeopardy bar to retrial. As the mistrials were "Government-provoked" as to both Defendants, the Court will analyze their Double Jeopardy claims together.

The Government made significant missteps in presenting its case at the second trial. These missteps, however, were exceedingly negligent and sloppy, rather than the result of an intentional plan by the Government to goad Defendants into moving for a mistrial. Additionally, as Defendants effectively concede, the trial was going relatively well for the Government prior to these missteps. Without evidence that the Government tried to cause a mistrial, or had reason to desire such a result, the Court cannot hold that the Double Jeopardy Clause bars retrial. *See Kennedy*, 456 U.S. at 675-76; *Williams*, 472 F.3d at 85. There is no such evidence in this case.


## III.   *BRADY* CLAIM

### A.   Legal Standard

In *Brady v. Maryland*, the Supreme Court held that criminal defendants have a due process right to access exculpatory and material evidence in the Government's possession with sufficient time to make use of that evidence at trial. 373 U.S. 83, 87 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment[.]"). The Third Circuit has joined other circuit courts in articulating a three-part test for deciding when a *Brady* violation has occurred: "(1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (internal citations omitted).

A prosecutor must disclose evidence which, "if made available [to the defendant], would tend to exculpate him or reduce the penalty." *Brady*, 373 U.S. at 87-88. A number of courts have found that evidence which suggests that another individual committed the crime is exculpatory.

*See, e.g.*, *United States v. Robinson*, 39 F.3d 1115, 1118-19 (10th Cir. 1994) (finding evidence that a witness had described the perpetrator as looking quite different than the defendant to be exculpatory); *Cannon v. Alabama*, 558 F.2d 1211, 1215-16 (5th Cir. 1977) (holding that an eyewitness statement which contradicted another witness's statement that the defendant was at the scene of the crime was exculpatory). Additionally, evidence that could be used to impeach a government witness may not be suppressed. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

"Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Wilson v. Beard*, 589 F.3d 651, 665 (3d Cir. 2009). Whether evidence tends to create this doubt is case-specific; if the other evidence in the case is relatively weak, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976). The Supreme Court has instructed that "the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citations omitted). The Court further explained that "[a] reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)). The materiality prong of the *Brady* test is sometimes phrased as the question of whether the suppression of evidence prejudiced the defendant.

The Government must disclose all exculpatory and material evidence in its possession. Whether the prosecutor had personal knowledge of the evidence is irrelevant, as "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437; *see also Giglio*, 405 U.S. at 154 ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."). Delayed disclosure of material and exculpatory evidence can violate the *Brady* rule even if the defendant eventually obtains the evidence. Circuit courts have recognized the importance of such a rule, noting that it would "eviscerate the purpose of the *Brady* rule and encourage gamesmanship were [courts] to allow the government to postpone disclosures to the last minute[.]" *See, e.g.*, *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009). The critical question in delayed disclosure cases is whether the evidence was disclosed "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983); *see also St. Germain v. United States*, Civ. A. No. 03-8006, 2004 WL 1171403, at *12 (S.D.N.Y. May 11, 2004) ("The suppression analysis hinges on whether, in light of all the circumstances, able defense counsel had a reasoned opportunity to put the exculpatory material to work."). Evidence must also not be otherwise available to the defendant through the exercise of reasonable diligence. *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991). Whether a delayed disclosure violates *Brady* depends on the nature of the evidence and the length of the delay, both of which affect the defendant's ability to make use of the evidence at trial. *See United States v. Golyansky*, 291 F.3d 1245, 1248-50 (10th Cir. 2002); *Leka v. Portuondo*, 257 F.3d 89, 100-01 (2d Cir. 2001).

### B.  Discussion

The *Brady* analysis is very similar for Alvin and Duffy because the charges against Duffy are based mainly on alleged connections between him and Alvin. The principal pieces of evidence against Duffy are his attempted cell phone calls with Alvin, his relationship with Alvin, and possibly that Duffy's cell phone was in the Conshohocken area at the time of the crime. As

such, evidence that exculpates Alvin exculpates Duffy with equal force. Unless otherwise noted, the following analysis applies to both Defendants.

i.    *Exculpatory nature of the evidence*

The evidence alleged to be *Brady* material consists of four reports produced by FBI labs dated April 15, 2010; May 25, 2010; November 9, 2010; and February 4, 2011. The report dated May 25, 2010, concluded that head hair from a Caucasian male was found in the "debris" associated with two duffel bags, a screwdriver,[3] and a package of rubber bands. Based on testimony presented at the mistrials, one of the duffel bags contained the other bag, the screwdriver, and the rubber bands. It appears that the hair was found in the bag among these objects. An eyewitness testified that he saw the suspect throw this duffel bag onto the roof of a nearby garage, where it was later recovered by police. Thus, the objects referenced in the May 25, 2010 report are objects that the Government contends were associated with and touched by Alvin. Another report, dated November 9, 2010, concludes that there were no latent prints of value on the following objects: the gloves found near the bank, two screwdrivers, a package of rubber bands, zip ties, a clock, and a pistol. The Government asserts that most of these objects were found inside the duffel bag thrown by the fleeing suspect.

Forensic evidence connecting an individual other than the defendant to the crime is clearly exculpatory. *See Yarris v. Cnty. of Del.*, 465 F.3d 129, 137 (3d Cir. 2006) (assuming that DNA evidence may not be suppressed under *Brady*); *Robinson*, 39 F.3d at 1118-19; *Cannon*, 558 F.2d at 1215-16. The Government asserts that the FBI reports contained no exculpatory

---

[3] In some of the FBI reports, item Q6 is identified as a screwdriver, while in other reports it is identified as a sweatshirt. FBI Agent Vito Roselli informed the Court that Q6 refers to a screwdriver, as he did not submit the sweatshirt that Alvin was wearing at the time of his arrest to the FBI laboratories for DNA testing. (Tr. of Second Jury Trial [Second Trial Tr.] (Nov. 5, 2013) at 206.) The Court will refer to Q6 as a screwdriver.

information and thus did not need to be disclosed, but it does not explain this assertion or identify authority supporting it.[4] Additionally, Defendants contend that the reports contain information that may be useful as impeachment evidence on cross-examination. The absence of Defendants' DNA or fingerprints on the duffel bag, coupled with the presence of Caucasian male hair on some of the bag's contents, could provide a basis to challenge the eyewitness's testimony that he saw the suspect throw the bag, or to challenge Sgt. Conner's identification of Alvin. *See Giglio*, 405 U.S. at 154. The Court agrees that this evidence is exculpatory.

    ii.    *Suppression*

Because Defendants are currently in possession of the FBI reports, this is a case of delayed disclosure. For a criminal defendant to receive a fair trial, exculpatory evidence must be disclosed at a time which "fully allow[s] [the defendant] to effectively use [the evidence]." *Higgs*, 713 F.2d at 44. In this case, a fair trial depends on disclosure by the Government because Defendants could not have obtained these reports through the exercise of reasonable diligence. The FBI report most useful to Defendants was produced on May 25, 2010, and was in the possession of the FBI case agent shortly thereafter. At the oral argument on the instant motions, the Assistant U.S. Attorney (AUSA) explained that he did not receive the reports from the FBI before the first two trials. He attributed this mistake to turnover among the FBI agents handling this case. The AUSA personally obtained these reports in November 2013. After the issue of undisclosed forensic testing was raised during the second mistrial, he searched his case file and asked the FBI case agent to send him all of the FBI lab reports, which the case agent did. The

---

[4] Indeed, the Government initially believed that it had turned over these reports. When the possibility that these reports had not been disclosed was first raised at the second mistrial, the Government asserted that the reports had been disclosed to Defendants. (*See* Second Trial Tr. (Nov. 5, 2013) at 206 ("Your Honor, I want the Court to convene a hearing. I want to have FBI Agent Roselli testify that all of this material that counsel is ranting about, has been turned over in discovery. He's had it since the beginning.")).

AUSA then failed to disclose the reports to Defendants until March 12, 2014. That the AUSA did not personally have the reports until six months before the third scheduled trial is not relevant to the Court's analysis; a prosecutor has an affirmative duty to learn of evidence known by any party working on the Government's behalf, and negligence is no defense to a *Brady* claim. *See Kyles*, 514 U.S. at 437; *Giglio*, 405 U.S. at 154. Thus, the exculpatory evidence in this case was withheld for almost four years.

The Government's principal argument is that it disclosed the evidence early enough for Defendants to make effective use of it, five days before trial. It further contends that, by continuing the trial set for March 17, 2014, this Court has given Defendants ample opportunity to use the evidence. The Court disagrees with the Government's first argument; disclosing forensic evidence five days before trial, after suppressing it for four years, does not allow Defendants time to interpret new evidence, investigate leads that it generates, and present a modified case at trial. The more difficult question is whether, even though the Court continued the third trial date, the long delay hampered Defendants' ability to fully and effectively use the evidence. The Court believes that Defendants were prejudiced by the delay.

The Third Circuit has indicated that evidence used merely to assist in cross-examination of a government witness is of a different character than evidence that is useful to the defendant "in a general pretrial investigation." *Higgs*, 713 F.2d at 45. It is more difficult for the defendant to assimilate the latter type of evidence at later stages of a case. *Leka*, 257 F.3d at 101 (noting that "new witnesses or developments tend to throw existing strategies and preparation into disarray"). The Court agrees that the DNA evidence contained in the May 25, 2010 report is potentially useful in general pretrial investigation, and thus it should have been disclosed in time

for Defendants to use it during the investigatory stages of the case. *See id.* at 100 ("[O]nce trial comes, the prosecution may not assume that the defense is still in the investigatory mode.").

Defendants assert that the delayed disclosure of the lab reports "prevented the defense from planning a comprehensive strategy and investigating leads that might have resulted in the identification of defense witnesses years ago." (Mot. to Dismiss by George Duffy [Duffy Mot. to Dismiss] at 4). It cannot be known what possible leads might have been generated four years ago had this information been timely disclosed, as the suppression of the FBI reports obfuscated a potential path of investigation. Had Defendants known that forensic evidence also tied a Caucasian male to the crime, perhaps they would have questioned witnesses or neighbors about this individual or searched the recordings of local video cameras in an attempt to identify him. Evidence of a potential alternative perpetrator could have created reasonable doubt as to Defendants' guilt, especially if it was bolstered by eyewitness or video evidence. However, it seems much less likely that the evidence will currently generate any leads. Defendants' ability to speak with people who lived or worked near the PNC Bank is limited, as employees get new jobs and people move away. Even if Defendants identified people who were near the bank five years ago, time has likely eroded memories of that morning. Additionally, Defendants have spent years creating defense strategies, and presumably selecting and preparing witnesses according to those strategies, which do not incorporate the information in the reports. Because of the extreme length of the delay and the potential of the FBI reports to lead to other evidence, the Court cannot say that Defendants currently have the ability to fully and effectively use this evidence at trial. *See Higgs*, 713 F.2d at 44. Thus, the disclosure of this exculpatory evidence was impermissibly delayed.

### iii.    Materiality

When assessing materiality, the Court must address whether there is a "reasonable probability that timely disclosure of the evidence would have changed the result of the proceeding." *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003). To determine whether each Defendant was likely prejudiced by the delay, the Court must consider the strength of the Government's other evidence against the Defendants. *See Agurs*, 427 U.S. at 113. However, the Court proceeds cautiously; though the Court has twice been presented with a significant portion of the Government's evidence against Defendants, the two mistrials never proceeded to the stage where the Defendants presented their own cases. As the evidence against each Defendant is different, the Court will discuss the Defendants separately.

### a.    Materiality to Alvin's defense

As noted above, the Government contends that Alvin was one of the two men who fled from the PNC Bank after a brief conversation with Sgt. Conner. At trial, Sgt. Conner identified Alvin as the suspect with whom he spoke. Another eyewitness observed the suspects running from the bank and followed the man. He testified that he saw this suspect throw a duffel bag onto the roof of a garage. This eyewitness observed the suspect at a distance of roughly fifty feet, and he testified that he did not view the suspect's face long enough to identify him.

Both Sgt. Conner and the other eyewitness saw gloves near the bank. During the first trial, neither testified that they saw the suspect drop the gloves. However, during the second trial, Sgt. Conner asserted that he saw the suspect drop the gloves as he ran. One of the gloves contained Alvin's DNA. Many of the objects in the duffel bag had the hair of a Caucasian male on them. Neither Alvin's DNA, nor his fingerprints, was found on the duffel bag or on any of the objects inside it. Alvin was apprehended roughly a half-mile from the bank within an hour of the

attempted robbery. A resident had spotted Alvin walking through his neighborhood, thought that he looked unfamiliar, and called the police to alert them of Alvin's presence. A bulletin that had gone out over the radio to police alerted them to be on the lookout for "A Black male, around 6'2" . . . [with] facial hair, roughly 28-35 years of age, wearing dark clothing." (Second Trial Tr. (Nov. 4, 2013) at 53). Alvin was fifty-one years old at the time of the crime. When he was apprehended, Alvin was wearing dark blue or black clothing, which is what the suspect had been described as wearing.

In his opening statement, Alvin asserted a defense of mistaken identity. On cross-examination, he challenged Sgt. Conner's ability to closely observe the suspect, who was wearing an oversized hooded sweatshirt with the hood up. He also challenged Sgt. Conner's identification by pointing out that he was much older than the original estimated age of the suspect. The remainder of Alvin's defense strategy is unknown to the Court, as the trials never proceeded far enough for Alvin to present his case.

Alvin asserts that the FBI reports are useful to his defense. The Court agrees that evidence of an alternative perpetrator could help Alvin challenge Sgt. Conner's identification of him as the fleeing suspect. It is unclear whether Sgt. Conner would testify that he saw the suspect drop the gloves at the third trial, as he did at the second trial but not at the first trial. If he does not testify as to this fact, there is no evidence that the gloves were dropped near the bank during the crime, and only Sgt. Conner's identification would tie Alvin to the bank on that morning. Here, forensic evidence of an alternative perpetrator has a high likelihood of creating reasonable doubt. If Sgt. Conner were to testify that he saw the suspect drop the gloves, Alvin could challenge his testimony by highlighting his prior inconsistent testimony and his limited ability to view the fleeing suspect while he was on the ground detaining the other armed suspect.

However, the forensic alternative-perpetrator evidence seems less compelling in this second context. Additionally, because two eyewitnesses identified the suspect as Black, it would be challenging for Alvin to convince a jury that the two eyewitnesses actually saw a White man running from the bank.

However, as noted above, the reports had the potential to generate other evidence that might have been helpful to Alvin. The Third Circuit has emphasized the importance of this inquiry. *Johnson v. Folino*, 705 F.3d 117, 131 (3d Cir. 2013) ("[T]he District Court must evaluate the materiality of each item of suppressed evidence individually, bearing in mind not only its content, but also where it might have led the defense[.]"). Unfortunately, because of the fairly unique posture of this case, the existence or strength of this potential evidence is currently unknowable. Because of this, it is also difficult to judge the probability that a timely evidentiary disclosure would have convinced a jury to acquit Alvin.

The uncertainty regarding what leads timely disclosure might have generated was created by the extreme length of the Government's evidentiary suppression, and the Court will resolve it against the Government.[5] Additionally, the Government has not offered any argument as to why this evidence is not material to Defendants' defense, or proposed solutions to mitigate the prejudice caused by the long delay. The question for the Court is whether the delayed disclosure so undermines the Court's confidence in the case that the Court no longer believes a trial could result in a fair verdict. *See Kyles*, 514 U.S. at 434. The nature and length of the disclosure delay

---

[5] The posture of the *Brady* claim in this case differs from that of *Brady* claims are raised on appeal or in petitions for habeas corpus; often, attorneys asserting this claim on appeal have spent significant time and resources investigating leads generated by the newly-discovered evidence. *See, e.g.*, *Leka*, 257 F.3d at 96 (noting that appellant was able to demonstrate prejudice after investigators tracked down two eyewitnesses with helpful testimony, one who had moved from New York to Florida since the incident, and another whose name had initially been misspelled on discovery documents). Other district courts similarly face motions to dismiss the indictment for *Brady* violations, but few disclosure delays are as lengthy as the delay in this case.

does undermine the Court's confidence in the case. Thus, the forensic evidence is material to Alvin's defense because there is a reasonable probability that timely disclosure of the FBI reports would have affected the outcome of his trial. *See Bagley*, 473 U.S. at 678.

> b. *Materiality to Duffy's defense*

The Government's disclosure delay prejudiced Duffy because Duffy's guilt depends on Alvin's guilt, and because the case against Duffy is weaker than the case against Alvin. The Court also agrees with Duffy that the evidence of the presence of another individual is especially material to his case, as this person could have been the getaway driver instead of Duffy.

The Government's evidence against Duffy is thin. It argues that cell phone records indicate that Duffy was in phone contact with Alvin while the suspect was running from the police. The Government also asserts that phone records demonstrate that Duffy was in the Conshohocken area around the time of the attempted crime. Additionally, at the second mistrial, the Government introduced evidence that Alvin asked an acquaintance to retrieve Alvin's wallet and keys from Duffy, as Alvin had left them in Duffy's car. At a probable cause hearing, the Government asserted that a jailhouse informant told the Government that the getaway driver's name started with the letter "D."

Duffy has a reasonably strong defense to this relatively weak case. When Duffy's attorney asked the Government witness if the phone records put Duffy closer to one yard or ten miles from the bank, the witness was unable to give any answer. Duffy lives near the PNC Bank in Conshohocken, and he argued that the cell phone evidence could easily indicate that Duffy was at his home during the attempted crime. He planned to call an expert on cell phone networks, likely to support this argument. During his opening statement at trial, Duffy's counsel also suggested that Duffy did not own a car at the time of the crime, and that the Government's

original theory was that a man named Buck dropped Alvin and Demetrius White off at the bank. Finally, Duffy pointed out that no physical evidence, video surveillance, or eyewitness testimony placed him near the bank.

The Court agrees with Duffy that the FBI reports are material to his defense. The evidence against Duffy was already weak, and the reports could bolster Duffy's case by introducing doubt as to Alvin's guilt, or by raising the possibility that another individual was the getaway driver. Therefore, there is a reasonable probability that the delayed disclosure negatively affected the outcome of Duffy's trial. *See Agurs*, 427 U.S. at 113.

*vi.*    *Conclusion and remedies*

The Government violated the *Brady* rule as to each Defendant by failing to timely disclose exculpatory and material evidence. It negligently withheld evidence for nearly four years, and it continued to knowingly withhold evidence for the six months after the AUSA came into possession of the evidence. "The duty of the prosecutor is to seek justice, not merely to convict," and the Government undermined the possibility of a just trial by withholding some of the forensic evidence in this case. (*See* Criminal Justice Standards Comm., Am. Bar Ass'n, Standards for Criminal Justice, Standard 3-1.2(c) (3d ed. 1993).) District courts have wide discretion to fashion an appropriate remedy for a *Brady* violation, including the granting of a continuance, suppression of evidence, "exclusion of [a] witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." *Burke*, 571 F.3d at 1054. However, though the *Brady* violation is relevant to the analysis of another of Defendants' claims, conclusions that the Court reaches elsewhere in this Memorandum make it unnecessary for the Court to fashion a remedy for the *Brady* violation in this case.

## IV.    CONSTITUTIONAL SPEEDY TRIAL CLAIM

Defendants primarily move to dismiss on the grounds that the long pretrial delay violated their constitutional rights to a speedy trial. The Government argues that Defendants' rights have not been violated because that the seventy-day clock set by the Speedy Trial Act has not yet expired. As the Speedy Trial Act explicitly states, the statute should not "be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution." 18 U.S.C. § 3173; *see also In re Grand Jury Investigation*, 600 F.2d 420, 427 n.26 (3d Cir. 1979). However, because the statute was enacted largely to make defendants' constitutional speedy trial rights meaningful, many courts have noted that "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the sixth amendment right to speedy trial has been violated." *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982); *see also United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014); *United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002).

This is an unusual case. The Court granted a number of continuances early in the case when it believed the ends of justice were served by delaying trial. At this time, upon consideration of the delays caused by two Government-provoked mistrials and the late discovery that the Government knowingly withheld *Brady* evidence, the Court believes that Defendants' constitutional rights to a speedy trial have been violated.

### A.    Legal Standard

The Sixth Amendment guarantees the accused the right to a speedy trial in all criminal prosecutions. U.S. CONST. amend. VI; *see also Doggett v. United States*, 505 U.S. 647, 651 (1992). The Supreme Court has explained that the Speedy Trial Clause is "designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless

18

substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald*, 456 U.S. 1, 8 (1982).

To determine whether the constitutional right to a speedy trial has been violated, courts consider the following four factors: "(1) the length of the delay before trial; (2) the reason for the delay and, specifically, whether the government or the defendant is more to blame; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant." *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (citing *Barker v. Wingo*, 407 U.S. 514, 530-32 (1972)). The test should be applied flexibly, based on the circumstances of the case, and no single factor is necessary or sufficient to the finding of a speedy trial violation. *Barker*, 407 U.S. at 533.

**B.     Discussion**

*i.     Length of the delay*

The first factor of the *Barker* test consists of two separate steps. *Doggett,* 505 U.S. at 651. First, to trigger a full speedy trial analysis, a defendant must assert that the delay in his case is uniquely long. *Id.* at 651-52 (explaining that the accused "cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness"). Second, if the delay is sufficiently lengthy to trigger a full *Barker* analysis, the length of the delay is separately weighed in that analysis. *Hakeem v. Beyer*, 990 F.2d 750, 760 (3d Cir. 1993).

The Supreme Court has noted that, "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett*, 505 U.S. at 652 n.1. In a complex case, as opposed to a case of

"ordinary street crime," a longer delay may be tolerated. *Barker*, 407 U.S. at 531. The Third Circuit has repeatedly noted that a delay of fourteen months is long enough to trigger further *Barker* analysis. *See Hakeem*, 990 F.2d at 760; *U.S. ex rel. Stukes v. Shovlin*, 464 F.2d 1211, 1214 (3d Cir. 1972). [P]retrial delay is often both inevitable and wholly justifiable. *Doggett*, 505 U.S. at 656. However, "once [the] threshold [triggering the *Barker* analysis] has been passed, 'the state, not the prisoner, bears the burden to justify the delay.'" *Velazquez*, 749 F.3d at 174 (quoting *Hakeem*, 990 F.2d at 770).

a.      *Length of Alvin's delay*

Alvin was arrested by Conshohocken police on May 1, 2009, and was initially held in the Montgomery County Prison. On February 11, 2010, he was transferred to the Federal Detention Center (FDC) in Philadelphia after being federally indicted on February 4, 2010. Alvin remains incarcerated at the FDC. "When an arrest on state charges is followed by a federal indictment, the right to a speedy trial in the federal case is triggered by the federal indictment, and the time period under consideration commences on that date." *United States v. Battis*, 589 F.3d 673, 679 (3d Cir. 2009). Thus, Alvin's constitutional speedy trial clock began to run on February 4, 2010. As it is currently July 1, 2014, the relevant period of delay is fifty-three months, or nearly four and one-half years. A full *Barker* analysis is warranted, and the Government bears the burden to justify this lengthy delay.

Considered itself in the *Barker* analysis, a delay of fifty-three months is extraordinarily long. It weighs heavily in favor of finding a speedy trial violation. *See Doggett*, 505 U.S. at 657 (noting that courts' "toleration of such negligence varies inversely with its protractedness . . . and its consequent threat to the fairness of the accused's trial").

b.      *Length of Duffy's delay*

George Duffy was arrested by federal authorities on November 10, 2010, and federally indicted on January 6, 2011. Because speedy trial delay is generally measured from "the date of formal accusation, *i.e.,* from the earliest date of arrest or indictment," Duffy's constitutional speedy trial clock began to run on November 10, 2010. *See Hakeem*, 990 F.2d at 760 (citing *MacDonald,* 456 U.S. at 6-7). The relevant period of delay is nearly forty-four months long. For a relatively simple case like this, even a much shorter delay would likely be long enough to require a full *Barker* analysis. *See Doggett*, 505 U.S. at 652 n.1; *Barker*, 407 U.S. at 531; *Hakeem*, 990 F.2d at 760. Duffy's forty-four month delay is extraordinary, and it weighs heavily in Duffy's favor in the first step of the *Barker* analysis.

ii.      *Responsibility for the delay*

The second factor, which party principally bears responsibility for the delay, is the "flag all litigants seek to capture." *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986). Courts must consider each cause of the delay, and must assign responsibility for each period of delay to either the government or to the defendant. *Id.* Depending on the nature of the delay's cause, the Court may weigh the delay heavily or lightly against the responsible party. *Id.* As to delays caused by the government, the Supreme Court has instructed that "[a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government," while a "valid reason, such as a missing witness, should serve to justify appropriate delay." *Barker*, 407 U.S. at 531. "A . . . neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* Similarly,

delays intentionally caused by the defendant, such as those resulting from frivolous motions designed to slow proceedings, are weighed more heavily against him.

Though the Third Circuit has not squarely addressed the issue of how to assign responsibility for the delays caused by mistrials, most circuit courts that have addressed the issue have examined the reasons for the mistrial and weighed the resulting delay accordingly.[6] *See United States v. Hall*, 551 F.3d 257, 272 (4th Cir. 2009); *United States v. Batie*, 433 F.3d 1287, 1291 (10th Cir. 2006); *United States v. Avalos*, 541 F.2d 1100, 1109 (5th Cir. 1976) (noting that mistrials caused by the government may be weighed against it, but that a completed trial that results in a verdict stops the constitutional speedy trial clock); *but see United States v. Tanh Huu Lam*, 251 F.3d 852, 856 (9th Cir. 2001) (measuring the speedy trial delay from the date of indictment until the beginning of the first trial, though that trial resulted in a hung jury and ended in mistrial). For example, the Tenth Circuit weighed delays from two mistrials against the government because the government was responsible for causing the mistrials. *Batie*, 433 F.3d at 1289-90. The first mistrial was caused by a government witness's introduction of prejudicial evidence, and the second trial ended in mistrial after a juror observed the shackled defendant. *Id.* However, in a case where the mistrial was caused by a hung jury, the Fourth Circuit held that delay caused was justified and not attributable to the government. *Hall*, 551 F.3d at 272. This approach seems faithful to the *Barker* Court's instruction to separately determine and weigh the reasons for each delay, and it is the approach adopted by this Court.

---

[6] The Government points us to *United States v. Dinzey*, 423 F. App'x 224 (3d Cir. 2011), to suggest that the Court should only consider the delay from the end of the second mistrial, as instructed by the Speedy Trial Act, 18 U.S.C. § 3161(e). Though the opinion purports to address Dinzey's constitutional speedy trial claim, Dinzey only sought relief under the Speedy Trial Act, and the Third Circuit cited only the statute and statutory precedent in its analysis of Dinzey's claim. The holding in that case was that the district court properly tolled the Speedy Trial Act clock while it considered pre-trial motions. *Dinzey*, 423 F. App'x at 226. Therefore, *Dinzey* does not foreclose Defendants' constitutional speedy trial claims.

a.      *Responsibility for Alvin's delay*

As noted above, Alvin's speedy trial clock began to run on February 4, 2010. His first trial date was set for March 29, 2010. Thus, the time between Alvin's indictment and trial was expected to be roughly seven weeks. To the extent that this time is considered a delay, it is fully justified and weighs against neither party.

Alvin moved for his first continuance on February 22, 2010, on the grounds that he had not yet received discovery from the U.S. Attorneys' office. Alvin stipulated that this time would be excludable for purposes of the Speedy Trial Act. The Court granted the motion and rescheduled the trial for November 15, 2010. This continuance caused a delay of seven and one-half months. The Government asserts that Alvin bears responsibility for this delay because he requested the continuance.[7] However, Alvin was put in the position of requiring the continuance by the Government's failure to turn over discovery. Many courts have held that delays caused by continuances requested by a defendant for similar reasons weigh against that defendant. *See, e.g.*, *United States v. Boone*, Crim. A. No. 00-3, 2002 WL 31761364, at *13 (D.N.J. Dec. 6, 2002) (weighing continuances requested by the defendant against him, where the defendant requested a number of delays but the government was "exceedingly responsive" and was clearly not trying to delay trial). In this case, the Government has engaged in a pattern of withholding evidence entirely or surprising Defendants by disclosing evidence on the eve of trial. Viewing the

---

[7] The Government further argued that Alvin waived his speedy trial rights by requesting the continuance. Here Alvin requested, and the Court granted, an "ends-of-justice" continuance under the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(7)(A). Alvin stipulated that the delay caused by the continuance he requested (in this case, sixty days) would be excluded from the Speedy Trial Act clock. This stipulation did not waive his constitutional right to a speedy trial. *See Velazquez*, 749 F.3d at 182. ("[C]ourts should indulge every reasonable presumption against waiver . . . [and] not presume acquiescence in the loss of fundamental rights.") (quoting *Barker*, 407 U.S. at 525-26). Courts regularly entertain constitutional speedy trial claims in cases where the criminal defendant has requested ends-of-justice continuances.

Government's discovery delay through this lens, the Court believes that the Government is more responsible for this delay than is Alvin, and it will weigh this delay against the Government. While the continuance was the initial cause of the seven month delay, the Court's busy calendar extended the delay. Thus, a portion of this delay is attributable to the Government's discovery delay, and a portion is attributable to the crowded court calendar. The seven-month delay weighs lightly against the Government.

The Court granted Alvin's second motion for a continuance on November 15, 2010. On November 8, 2010, the Government first told Alvin that it planned to introduce some type of inculpatory DNA evidence at trial. Two days later, the Government gave Alvin a copy of the relevant FBI lab report, which demonstrated that Alvin's DNA was on one of the gloves found near the PNC bank. Alvin's attorney[8] moved to suppress the evidence, arguing that the late disclosure would make it impossible for Alvin to re-prepare his defense in time for the trial, which was then scheduled for November 15, 2010. Alvin noted that he did not want to request another continuance because he did not want to jeopardize his speedy trial rights. However, when this Court denied Alvin's motion to suppress, he moved to continue the trial. The Government had taken a DNA sample from Alvin in advance of the first trial date, in early March 2010. It took the Government nine months from the time of Alvin's indictment to match Alvin's DNA to one of the gloves. If the initial trial date had not been continued, this would have been too late for use in Alvin's first trial. The AUSA explained that there was a slightly unusual delay at the FBI lab. This second continuance led to a four-month delay, as a third trial date was set for March 14, 2011. Like the first continuance, the reason for this delay is the Government's

---

[8] On May 14, 2010, Mark Wilson replaced Tracy Frederick as Alvin's attorney, due to Frederick's maternity leave. Both attorneys were employed by the Federal Community Defender Office.

delay in obtaining and disclosing evidence. It was compounded by the Court's busy calendar, and thus it is weighed lightly against the Government.

The Court granted Alvin's third motion for a continuance on March 9, 2011. Alvin had moved to dismiss his lawyer, and a new attorney was appointed for him. This new attorney, Michael Fanning, requested the continuance so that he could familiarize himself with the case and prepare for trial. Alvin is responsible for the delay resulting from his replacement of his lawyer. *See Vermont v. Brillon*, 556 U.S. 81, 85 (2009) ("[D]elays sought by counsel are ordinarily attributable to the defendants they represent."). Alvin requested a ninety-day continuance, but the fourth trial date was set as June 11, 2012, resulting in a one year and three month delay. During this time, on December 30, 2011, Fanning withdrew from the case.[9] The Court appointed John Griffin as Alvin's attorney on January 12, 2012. Thus, at least part of the lengthy delay was caused by this turnover.

On May 30, 2012, Alvin again moved for a continuance. Fanning had not fully turned discovery over to Griffin, and thus Griffin was not ready for trial. Following this motion, the fifth trial date was set as November 26, 2012. The period of delay resulting from this continuance was five and one-half months. This delay weighs against Alvin, as actions of defendants' counsel are imputed to the defendant. *Brillon*, 556 U.S. at 85.

The case proceeded to trial on November 26, 2012, and ended in mistrial. After the mistrial, the sixth trial date was set for January 22, 2013. The Court declared the mistrial after the Government elicited prejudicial testimony from one of its witnesses. Though the Government bears responsibility for the mistrial, its actions in failing to properly prepare its witness were merely negligent. On January 16, 2013, Alvin's attorney moved to continue the trial again so he

---

[9] Michael Fanning had changed jobs, and his new position made him unable to represent Alvin.

could have time to prepare a motion to bar retrial, as he had not yet received a transcript of the first trial. The Court granted this motion and set the seventh trial date for July 15, 2013. The delay caused by the mistrial, and by the associated motions, is lightly weighed against the Government. *See Batie*, 433 F.3d at 1291 ("The government argues that four months' delay was caused by [defendant's] motions for mistrials and seems to blame him for the delay. However, this time must weigh against the government, although less heavily than deliberate misconduct.").

Alvin's lawyer was unable to attend the next scheduled trial date, so the Court set the eighth trial date for August 19, 2013. The Government then moved to delay the trial because an essential witness could not attend. The ninth trial date was set for November 4, 2013. The Supreme Court has been clear that the unavailability of essential witnesses justifies a delay. The three and one-half month delay attributable to the unavailability of Alvin's lawyer (a necessary party) and the Government's unavailable witness weigh against neither party.

The second trial ended in mistrial on November 5, 2013, as a result of multiple mistakes by the Government. The delay caused by this mistrial weighs heavily against the Government. Though the Government did not act intentionally in causing the mistrial, the level of negligence evidenced by the number and type of errors is very high. That these mistakes were made during the second trial, after the Government had already caused one mistrial and should have made every effort to present an error-free case, makes the Government's ill-preparedness more astounding. *See Doggett*, 505 U.S. at 657 (explaining that government negligence over a long period of time, or at a late juncture, is more prejudicial than simple negligence). After the mistrial, a tenth trial date was set for December 9, 2013. This date was rescheduled at Duffy's request, as his expert witness could not attend the trial on that date. As noted above, the delay

resulting from Duffy's request is justified. As the eleventh trial date was set for March 17, 2014, only one month of delay caused by the second mistrial weighs against the Government, but it weighs quite heavily.

The trial was again continued on March 13, 2014, after the Government disclosed the *Brady* material. It is now July 1, 2014, and the Court has taken the intervening months to address this issue. The delay resulting from this late disclosure weighs very heavily against the Government. Of particular concern to the Court is that, six months before the third trial date, the Government was on notice that Defendants had not received the exculpatory FBI report. Defendants raised this issue at the second mistrial on November 5, 2013, where they made clear that they wanted the Government to disclose all available forensic evidence. This evidence was in the Government's possession for four years, and the AUSA personally received the relevant report shortly after the second mistrial. However, the Government did not disclose this evidence until five days before the third trial date. When asked why he waited nearly six months after personally receiving the FBI reports to disclose them to Defendants, the AUSA responded that he had "every intention" of turning them over but "just neglected to actually" do so. This delay is even less excusable in this case, where the Government's late disclosures of other evidence had previously delayed trial. Because the Government was knowingly withholding *Brady* material that it knew Defendants would want to incorporate into their defenses, the Court believes that the Government's conduct here is especially egregious. The three and one-half month delay caused by this disclosure weighs heavily against the Government.

In sum, over twenty-four months of delay weigh against the Government. Much of this delay weighs fairly lightly against it, but the delays caused by the second mistrial and the late disclosure of *Brady* material weigh very heavily against it, although not as heavily as intentional

conduct. At most, twenty and one-half months of delay are attributable to Alvin, the majority of which is attributable to attorney turnover and one attorney's failure to give the case file to his replacement. This negligence is imputed to Alvin and weighed against him, but it is not weighed very heavily. The remainder of the delay in this case was caused by reasons that justify delay, such as the unavailability of an essential Government witness or the inability of counsel to attend a trial date set by the Court. The Court does not weigh them against either party.

The Government bears responsibility for more months of delay than does Alvin, but Alvin also caused a significant portion of the delay. Though the total delay in this case is quite long, much of that time is attributable to issues that arise in many cases, such as discovery delays, delays at the FBI lab, attorney turnover, and a crowded court calendar. If the case had proceeded to trial after these early delays, there would almost certainly be no constitutional speedy trial claim. The resolution of this case was uniquely delayed, however, by the two Government-caused mistrials and the late disclosure of *Brady* material. In particular, the delay caused by the Government's knowing suppression of that evidence weighs heavily against it. In contrast, there is no evidence that Alvin intended to delay the trial or engaged in dilatory litigation tactics. *Cf. Boone*, 2002 WL 31761364, at *13 ("The docket shows . . . about thirty pretrial motions filed by the defendant."). The Government is principally responsible for the long and largely unjustified delay in this case.

> b.  *Responsibility for Duffy's delay*

Duffy asserts that he requested only one short continuance in this case: to postpone the trial set for December 9, 2013, because his expert witness could not attend trial on that date. The two-month delay caused by this continuance, occasioned by the absence of a witness essential to Duffy's defense, is justified. However, Duffy also moved for a continuance on March 8, 2011,

28

asking for more time to prepare for trial. Alvin moved for a continuance on the same date. As noted above, these continuances caused the Court to delay the trial one year and three months. Duffy asserts that he simply intended to join Alvin's motion to give Alvin's newly-appointed counsel time to prepare; he would not have requested more preparation time on his own. Duffy cannot abdicate all responsibility for the delay caused by these continuances, but it is clear that he does not bear significant responsibility for the delay. Even weighing this delay lightly against him, Duffy is responsible for very little of the forty-four month delay in this case.

        *iii.*        *Assertion of the right*

"[T]he defendant's assertion of or failure to assert his right to a speedy trial is one of the factors to be considered in an inquiry into the deprivation of the right." *Barker*, 407 U.S. at 528. A defendant who fails to assert his speedy trial right has not necessarily waived it; however, such a failure "will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532. The Third Circuit has instructed that, "while the defendant bears 'some responsibility to assert a speedy trial claim,' the prosecution retains the burden to show the knowing and voluntary waiver of a fundamental right. . . . Thus a defendant's limited responsibility to assert his speedy trial right exists alongside the government's overarching burden to prove waiver of that fundamental right." *Velazquez*, 749 F.3d at 182 (quoting *Barker*, 407 U.S. at 529).

Depending on the nature of the defendant's assertions, courts may assign them more or less weight. Courts look for defendants to assert their speedy trial rights in a "timely and proper" manner. *Hakeem*, 990 F.2d at 764. Evidence that the defendant "vigorously pursued a speedy trial" is afforded more weight, while assertions made while the defendant's other behavior evidences an unreadiness to proceed to trial are assigned minimal weight. *Id.* at 764-65 (internal citations omitted). When a defendant is represented by counsel, "he should identify 'a motion or

some evidence of direct instruction to counsel to assert the right at a time when formal assertion would have some chance of success.'" *Battis*, 589 F.3d at 681 (internal citation omitted). Less formal assertions, such as correspondence addressed to the Court, are weighed less heavily for represented defendants. *Id.* However, a *pro se* defendant "does not have to make a procedurally perfect assertion of his speedy trial rights, but must make a reasonable assertion of the right so as to put authorities on notice of his Sixth Amendment claim." *Id.* (citing *Douglas v. Cathel,* 456 F.3d 403, 418 (3d Cir. 2006)).

### a. Alvin's assertion of his rights

On August 6, 2010, Alvin filed a *pro se* motion to dismiss the indictment, which asserted that he was "worried . . . about his Speedy Trial rights." Again on November 10, 2010, in his motion to preclude DNA evidence, Alvin noted through counsel that he was reluctant to seek a continuance because he was concerned about his statutory and constitutional speedy trial rights. On June 27, 2011, Alvin moved *pro se* to dismiss the indictment against him, explicitly seeking relief under the Speedy Trial Clause of the Sixth Amendment. Together, these motions are fairly strong evidence that Alvin asserted his speedy trial rights. *See Battis*, 589 F.3d at 681.

After the two trials ended in mistrial, Alvin filed a *pro se* motion for reconsideration of his motion to dismiss the indictment. He referred to his lengthy incarceration, but he did not explicitly assert his speedy trial rights. Alvin again mentioned his long incarceration at a hearing on March 13, 2014. In a letter to the Court dated May 4, 2014, Alvin argued that the prosecution intentionally stalled this case, again lamenting his lengthy incarceration and worrying that he has been "too patient" in waiting to be brought to trial. These less formal assertions are less weighty evidence that Alvin continued to assert his speedy trial rights. *See id.*

Importantly, there is no evidence that Alvin disingenuously asserted his speedy trial rights despite being unready to proceed to trial. *See Hakeem*, 990 F.2d at 764-65. The Court believes that Alvin made consistent, if at times informal, assertions of his right. This factor weighs in his favor.

b.    *Duffy's assertion of his rights*

Duffy concedes that he did not assert his speedy trial rights until he moved to dismiss the indictment on speedy trial grounds in the instant motion. He asserts that he had no reason to believe his rights were in danger, and thus that he needed to remind the Government of its burden to prosecute him, because the case twice proceeded to trial. While the Court agrees with Duffy that the two trials in this case could have misled Duffy into believing his speedy trial rights were not in danger, that does not entirely relieve him of his duty to assert those rights. However, the Government bears the burden to show the "knowing and voluntary waiver of [this] fundamental right." *Velasquez*, 749 F.3d at 182. It has not attempted to make such a showing. As such, Duffy's failure to assert his right does not preclude his speedy trial claim, but this factor weighs against him.

iv.    *Prejudice*

The Supreme Court has outlined two ways in which defendants can demonstrate that they were prejudiced by a delay. *Battis*, 589 F.3d at 682. First, a defendant may attempt to demonstrate that he suffered "specific prejudice" from the delay. *Id.* Specific prejudice occurs when the delay impinges upon one of the interests protected by the Speedy Trial Clause: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532.

However, the Supreme Court in *Doggett* recognized that "consideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim." 505 U.S. at 655. The Court further explained that "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Id.* Because of this, courts "generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* In this category of case, where so much time has passed that prejudice to a defendants case is likely unknowable, prejudice is presumed. *See Velazquez*, 749 F.3d at 175 ("Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice."). "This presumption of prejudice can be mitigated by a showing that the defendant acquiesced in the delay, or can be rebutted if the Government 'affirmatively prove[s] that the delay left [the defendant's] ability to defend himself unimpaired.'" *Battis*, 589 F.3d at 682 (quoting *Doggett*, 505 U.S. at 658 & n.1).

In determining when the delay is so lengthy that prejudice is presumed, both the overall length of the delay and the portion of the delay attributable to the Government are relevant. *Battis*, 589 F.3d at 682-83. The *Doggett* Court held that an eight-year delay, six years of which were attributable to the government, was presumptively prejudicial. *Doggett*, 505 U.S. at 657-58. The Third Circuit has held that a delay of fourteen months was not presumptively prejudicial, *see Hakeem*, 990 F.2d at 755, but that a delay of forty-five months (where the government was responsible for thirty-five months) was presumptively prejudicial, *see Battis*, 589 F.3d at 683. A delay of six and one-half years, where the defendant was missing but the government was not

reasonably diligent in its efforts to locate him, was also presumptively prejudicial. *Velazquez*, 749 F.3d at 186.

a. *Prejudice to Alvin*

In this case, there was a fifty-three month delay in bringing Alvin to trial. The Government is responsible for over twenty-four of those months. Alvin's delay is thus longer than the appellant's delay of forty-five months in *Battis*, but the Government is responsible for fewer months of delay than it was in *Battis*. 589 F.3d at 683. However, while the government in *Battis* was merely negligent in failing to bring the defendant to trial, some of the delay in this case was caused by more culpable conduct of the Government. Additionally, the rationale for presuming prejudice in cases of extraordinarily long delay is that prejudice is both highly likely and very difficult to prove; the passage of time almost certainly has deleterious effects on the presentation of an effective defense. *Velazquez*, 749 F.3d at 175; *Battis*, 589 F.3d at 682. This rationale strongly applies to the instant case, where the Government withheld exculpatory evidence in violation of *Brady* for over forty-eight months of the fifty-three month delay. As noted earlier, this evidentiary suppression introduces uncertainty, hard to resolve at this late juncture, as to what evidence Defendants' would have presented absent the *Brady* violation. Thus, analyzing this factor in the "particular context" of this case, *see Barker*, 407 U.S. 522, the Court will presume that the delay prejudiced Alvin.

Moreover, even if the Court does not presume prejudice, Alvin is able to demonstrate some degree of specific prejudice. The length of his incarceration, over five years, is oppressively long for a pretrial detainee. *Barker*, 407 U.S. at 532. Alvin was prejudiced, as any person would be, by this "dead time" spent at the FDC. *See id.* ("The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family

life; and it enforces idleness."). Additionally, that the delays actually benefitted the Government's case demonstrates prejudice to Defendants. This prejudice does not stem from the weakening of the Defendants' cases, but from the strengthening of the Government's case that occurred while the Government withheld exculpatory evidence. First, though the Government did not have inculpatory DNA evidence against Alvin at the time the first trial was scheduled, it was able to introduce this evidence at the first actual trial. Second, during the second trial, the Government introduced audio recordings of a phone call that purportedly connected Duffy to Alvin and to the crime. There was no indication that the Government had this evidence at the time of the first trial. Third, at the second trial but not the first, an eyewitness testified that he had seen the fleeing suspect drop a pair of gloves that contained Alvin's DNA. Thus, even if the Court had not presumed prejudice, Alvin is able to demonstrate specific prejudice in the form of oppressive pretrial incarceration and some prejudice to his case.

b.    *Prejudice to Duffy*

The length of Duffy's speedy trial delay is forty-four months. Like the defendant in *Battis*, Duffy is not responsible for much of the delay. *See Battis*, 589 F.3d at 679-80. Duffy twice requested continuances: first on March 8, 2011, at the same time as Alvin so that he could have time to prepare for trial; and second on December 3, 2013, because his expert was unable to attend the scheduled trial date. As noted above, the delay of one year and three months resulting from the first continuance is attributable mostly to Alvin. Duffy's second continuance resulted in a two-month delay. Even if the full weight of both of these delays is subtracted from Duffy's total delay, which the Court does not believe they should be, twenty-nine months of delay are attributable either to the Government, or to Alvin. *See Velazquez*, 749 F.3d at 175 ("[T]he government has the burden to prosecute a case[.]"). This is slightly less time than was

attributable to the government in *Battis*, but in this context, where Duffy bears very little responsibility for the delay and where his ability to prepare his defense was limited by the *Brady* violation, the Court will presume that Duffy's pretrial delay prejudiced him.

Duffy can also demonstrate that he suffered some degree of specific prejudice from the delay. He was incarcerated for approximately three and one-half months before being released in February 2011. Since his release, Duffy has been under house arrest and electronic monitoring, though his restrictions have been reduced over time. At most times during his pretrial delay, his restrictions did not prevent him from remaining employed. However, considered together over the long period of Duffy's pretrial delay, the restrictions support a finding of some specific personal prejudice to Duffy. Additionally, the strengthening of the Government's case over time prejudiced Duffy as much as it prejudiced Alvin. Even if the Court were not to presume that the delay was prejudicial, Duffy has demonstrated that the delay caused him a degree of specific personal prejudice and prejudice to his case.

    v.    *Balancing the* Barker *factors*

The length of Alvin's delay is extraordinary; the Government bears more responsibility than Alvin for that delay; Alvin has consistently asserted his speedy trial rights; and the Government has not rebutted this Court's presumption that the delay prejudiced Alvin. After balancing these factors in the context of this case, the Court believes that Alvin's Sixth Amendment speedy trial rights have been violated.

Duffy's delay is also very long, and the Government bears more responsibility than Duffy for this delay. Indeed, Duffy bears exceedingly little responsibility for the delay. Duffy did not assert his speedy trial rights, but the Government has not borne its burden to demonstrate that Duffy waived those rights. In the context of this case, Duffy's failure to assert his rights is not

fatal to his claim, though it weighs against him. As in Alvin's case, the Court presumes that Duffy was prejudiced by the delay, and the Government has not successfully rebutted that presumption. His constitutional speedy trial rights have been violated.

           *vi.*    *Remedy*

The remedy for a Sixth Amendment speedy trial violation is to dismiss the indictment with prejudice, and that is the remedy that this Court will impose. *Velazquez*, 749 F.3d at 167. Like other courts that have imposed this remedy, this Court recognizes the significance of dismissing the superseding indictment against both Defendants. *See id.* at 186. The Government has expended tremendous resources in prosecuting this case, though some of this expense, including the empaneling of two juries, was caused by the Government's negligence. Additionally, the FBI and the Conshohocken police department spent time and energy investigating this crime, and both the state and federal government have spent resources incarcerating Alvin. The Court recognizes that dismissing the indictments will prevent the convictions of two men who allegedly intended to commit a serious crime. However, because the Court no longer believes that the case against either Defendant can fairly proceed to trial, dismissal of the superseding indictment is the "necessary cost for the protection of the speedy trial right set forth in the Constitution." *Id.* Orders consistent with this Memorandum will be docketed separately.